NELLIE EDWARDS ET AL

*vs.*

CUMBERLAND COUNTY POWER & LIGHT CO.

NELLIE EDWARDS ET AL

*vs.*

CUMBERLAND COUNTY POWER & LIGHT CO.

York.      Opinion June 14, 1929.

*William H. Gulliver*, for plaintiffs.
*Verrill, Hale, Booth & Ives,*
*Emery & Waterhouse,* for defendant.

SITTING: WILSON, C. J., DUNN, STURGIS, BARNES, PATTANGALL, FARRINGTON, JJ.

BARNES, J.  Two actions were tried together and resulted in verdicts for the plaintiffs for loss of a house and its contents, by fire, and defendant brings the case up on motion and exceptions.

The defendant is a public service corporation, at the time of the fire engaged in the business of transmitting over its wires, upon poles exclusively used by it, electric current for light and power.

The poles in the vicinity of the house that was burned were maintained on the easterly side of the highway leading from Biddeford to Biddeford Pool. The house stood some seventy-five feet back from the highway and on the easterly side thereof. The pole of defendant nearest the house was on the margin of the highway a little north of the northerly corner of the house and about seventy-five feet therefrom. The next pole stood one hundred thirty-nine feet southerly, and the street was straight.

The fire occurred after the parting of two wires, that were carried on the easterly portion of the highest of three cross-arms.

These two wires of uninsulated, No. 6 hard-drawn copper, and a third wire of the same type and material, on the other portion of the same cross-arm, were high-voltage wires, carrying an 11,000 volt current. Beneath this cross-arm was a second, supporting four insulated wires, the middle wires carrying 2,300 volts, the other two being a part of the street lighting circuit.

The lowest cross-arm supported two 115 volt wires, and from a

buck-arm, on the pole nearest the house and below the three cross-arms, service wires led to the house, to which they were attached near the northerly front corner at a point near the eaves.

From this point, through an iron pipe, the service wires were conducted to cellar wall and thence into a meter within the cellar, to furnish current for the lighting system in the house.

There is no contention that the poles, cross-arms, insulators, wires and necessary transformers were not of proper material and design at the time of installation; but it is claimed that at the time of the fire the interval between the poles in front of the house was too great; that the two high voltage wires sagged excessively between the poles, and that, due to such sag, or to some defects in the two wires, while charged with 11,000 volts they parted, came in contact with the service wire running into the house and through it discharged a current of such voltage to the house as to ignite the house and thus destroy it, with its contents.

The fire was discovered by a neighbor who, looking from his home, about eight hundred feet distant "saw fire," on the afternoon of Monday, April 7, 1924, between the hours of four and five, who hurried to the scene, and found the main house "pretty well burned then."

He broke a window, entered the kitchen, came out almost at once, and testified that then "the upstairs was all afire, and we didn't dare to go back again."

Thus the first knowledge of fire in the house was in the late afternoon.

At 9.45 A. M. on this day the Biddeford Pool circuit automatically registered a short circuit or other serious defect in the lines.

Workmen found the two wires parted, and repaired them by splicing, so that the current was turned into the circuit about 10.57.

At 11.23 the current was again shut off for a few minutes while a transformer was being repaired.

Plaintiffs' complaint is that for a few minutes, after the break in the circuit, a current of too high voltage for the service wire was communicated to the house over the service wire, and that it started ignition, which after an interval of about seven hours burst into flames visible to a neighbor.

While the house was unoccupied from the November before, the service switch was left "on" and two men had occupied the house from Monday to Friday afternoon of the week before the Monday on which it was burned. These men were working on the property and maintained a fire in the kitchen stove and after work used a kerosene lamp as their needs required.

On the morning of April 7 there was a rainstorm; it was raining when a traveller on the road saw the wires down in the road and evidently still charged with electricity. The wind was from the east, strong enough to blow the wires "Sometimes straight down the road and sometimes about straight across the road," as reported by the traveller.

Another witness for the plaintiffs testified it was rainy and the wind was blowing very hard.

Two of the three workmen who made the repairs testified as to the service wires leading to the house, one that they were still in position, and the other that they were not down.

When the neighbor, the first man at the fire, entered the yard he saw the conduit pipe on the ground, together with the service wires, and noticed that the latter were smoking.

Two employees of defendant who arrived at the scene of the fire at about 6 o'clock, saw the service wires, extending from the pole to the ground; one climbed the pole, cutting them there and also at the end of the conduit pipe: the other took them away and placed them in the waste.

It is a law of the world of physics that when two bare wires carrying current of high voltage approach nearly to contact the current will leap across the gap, and an arc is formed, accompanied by intense heat; the higher the potential of the current the wider the gap that an arc will bridge.

So when a high voltage wire comes in contact with one of less intensity the current will flow over the latter.

On the theory that the high voltage current escaped into the house the plaintiffs declare against the defendant, that it negligently so maintained its wires and other equipment that its wires became crossed so that electrical current of high potential voltage entered plaintiffs' building and caused the same together with the contents thereof to become ignited and to be burned.

By their declaration plaintiffs acknowledge the rule to require reasonable care, and the adoption of reasonable precautions only of defendant.

In reference to the duties incumbent on the vendor of electricity, by reason of the danger it presents to those who come in contact with it, and as to the methods and appliances for its proper delivery to customers these are to be determined under the general principles of the law of negligence. *Turner* v. *Southern Power Co.*, 154 N. C., 131, 32 L. R. A. (N. S.), 848, 17 Ann. Cas., Note P. 1046.

A vendor of electricity, engaged in the distribution of current over its lines to consumers, is bound to exercise due care and diligence in the construction, maintenance, inspection and operation of its lines, and in selection, installation and inspection of its appliances, so as to afford to the consumer assurance of a reasonable degree of safety.

"The degree of care required of one whose breach of duty is very likely to result in serious harm is greater than when the effect of such breach is not near so threatening." *Turner* v. *S. Power Co.*, supra. No liability to respond in damages will attach in the absence of negligence on the part of the company or its employees proximately causing the injury complained of. 9 R. C. L., 1197; *Nelson* v. *Narragansett Electric Lighting Co.*, 26 R. I., 258, 67, L. R. A., 116.

"The standard of care required of the defendant was such care as an ordinarily reasonable and prudent person would have exercised under like circumstances." *O'Brien* v. *White & Co.*, 105 Me., 308.

"The amount of care necessary, of course, varies with the danger which is incurred by negligence." *Boyd* v. *Portland Gen. Elec. Co.*, 37 Or., 567, 52 L. R. A., 509.

If the circumstances are found to be dangerous the degree of care to be exercised is correspondingly high.

"The danger is great, and the care and watchfulness must be commensurate with it." *Haynes* v. *Raleigh Gas Co.*, 114 N. C., 203, 26 L. R. A., 810; *Perham* v. *Portland Gen. Elec. Co.*, 33 Or., 451, 40 L. R. A., 799.

"In undertaking, for hire, to deliver so dangerous an element

as electricity into the houses of people for every day use great care and caution should be observed — such a degree of care and caution as is commensurate with the danger — which danger is enhanced by the lack of knowledge and of the means of knowledge, by the consumer, of the safety of the means and appliances employed to deliver it." *Alton Illuminating Co.* v. *Foulds*, 190 Ill., 367, 60 N. E., 537. As the danger to property from permitting wires carrying electric currents of great intensity or high voltage to come in contact with those designed for the carriage of currents of less intensity, and fitted with appliances designed for the conduct of such currents of less intensity, is very great, the courts are unanimous in holding that the care required to avoid such contact must be commensurate with the danger. 16 Ann. Cases, 1195.

So it is the duty of a company conducting electric currents of great intensity by means of wires not only to make the wires safe, but to use due care, commensurate with the danger inherent in their business, to keep them safe by inspection and repair.

It is not contradicted that defendant's line of poles and wires was rebuilt less than four years before the fire, and that in all respects the construction of the lines was in accordance with the best engineering practice and equalled or exceeded, as to margin of safety, the standards recommended by the Bureau of Standards of the United States Government.

It is true that the parting of the wires is sufficient evidence to put upon the defendant the burden of proving that it had exercised due care in construction, maintenance and inspection.

Plaintiffs claim to recover under the doctrine of *res ipsa loquitur*, but, "This maxim of the law extends no further in its application to cases of negligence than to require the case to be submitted to the jury upon the facts in issue." *Ridge* v. *R. R. Co.*, 167 N. C., 518.

"The applicability of the maxim does not affect the burden of proof. It merely shifts the burden of evidence, and requires the defendant to go forward with evidence tending to exonerate him.

"Nor does the application of the maxim affect the general rule, when the evidence is so clear and convincing that reasonable minds would not differ in their conclusions therefrom, the question of the defendant's negligence is for the court, and not for the jury.

"It was said in (66 Vt., 331, 347) that the maxim does not *apply* to such a case. Perhaps it would be more accurate to say that the maxim does not *avail* in such a case. The thing that defeats the plaintiff is, not that the maxim does not apply, but that its force and effect are rebutted by the proof. A defendant is not required to overcome the *prima facie* case which the maxim makes of evidence showing the fact of the accident happening in circumstances making the maxim applicable. All he is called upon to do is to produce exculpating evidence of equal weight. In such cases, the plaintiff fails, if the force of the maxim is counterbalanced by the facts disclosed." *Humphreys* v. *Twin State Gas & Elec. Co.*, 100 Vt., 414, 139 Atl., 440.

There should be no confusion of terms. The doctrine, *res ipsa loquitur*, justifies on the part of the jury an inference of negligence (we are not now discussing the burden of evidence) ; it does not raise a presumption of negligence.

"Owing to the fact and circumstances of the defendant having the management and control of the wires and poles, the same being charged with a dangerous current of electricity, and the wire being found broken and lying in the highway, and the cause of plaintiff's injuries, the jury would be warranted in inferring negligence on the part of the defendant.

"Such an inference of negligence, if drawn by the jury, would become a conclusion founded upon common experience.

"To say that a presumption of negligence arises from the foregoing facts and circumstances is to say that those facts and circumstances create a rule of law, which would necessarily cast upon the defendant the burden of overcoming the same by a preponderance of evidence and not merely meeting them by evidence of equal weight." *Glowacki* v. *Railway & Power Co.*, 116 Ohio St., 451.

In the case at bar plaintiffs received full advantage from the doctrine *res ipsa loquitur* when the case was submitted to the jury.

As to construction, negligence is predicated upon an excessive sag, or slack, of the wires that parted, between the two poles.

In the record we find no evidence of the depth of sag.

But we do find it uncontradicted that on a line of the type of construction maintained by defendant in front of the house that was burned, a span of one hundred seventy-five feet is permissible,

the clearance between wires should be not less than 11.18 inches (clearance here was 14.5 inches) and the sag should not exceed 30.4 inches.

A degree of sag is necessary. In the nature of suspended wires, a horizontal could not be maintained. To provide for the contraction of the metal, lines erected in summer must have an allowance of sag to compensate the contraction present in colder seasons.

The only evidence in the matter of sag is that three similar wires were suspended on the topmost cross-arm. Such inspection as had been made did not reveal sag of the two that parted, more than of the third which outrode the storm before the fire.

And the workmen who spliced the parted wires at the cross-arm testified that the sag of the wire that had not parted, as he sighted across the span, from insulator to insulator was not more than fourteen (14) inches.

It is in the testimony that the dropping of a twig of a tree upon two such wires as these will cause a short circuit, and the wires will be instantly burned. It is in the testimony that a poplar tree stood in the house yard, easterly from the wires and about twenty (20) feet southerly of the pole nearest the house.

Two wires parted at the same distance from the pole. The point of severance in each was opposite such point in the other.

The argument of defect in the material is not stressed, but the jury should give full effect to the probability that some foreign substance, like a twig, may have fallen across the two wires at this point.

In argument that the high-voltage current ignited the house, plaintiffs' counsel present decided cases and urge that they are authorities that the jury was justified in considering it proven in the case at bar that because defendant's high power wire may have caused the fire it must necessarily have done so.

But examination of the cases cited reveals that in each there was substantial evidence in addition to the mere probability.

In *Newman* v. *Electric Co.*, 28 Idaho, 764, where a barn constructed of corrugated iron (a good conductor of electricity), and filled with hay which protruded outward through cracks, and where the wires hung along the sides of the barn, the court says, "There was substantial evidence tending to show that respondent's loss was due to appellant's negligence."

*St. George Pulp & Paper Co.* v. *Southern N. E. Telephone Co.,* 91 Conn., 563, is a suit to recover for the loss of a building burned.

In this case the defendant, with a street railroad company, and the city, furnishing current for power and light, attached their wires to a pole on one side of the building.

Several of the wires carried current of high potential, some 2,300 and others 5,000 volts or more, and such wires ran through the branches of trees. Defendant carried its cable over the roof to a pole on the side of the building opposite from the tree, and allowed it to rest on the ridge pole of the building.

At the time of the fire arcing was observed among the branches of the trees. The court held the defendant chargeable with knowledge that such arcing might occur and that its cable might become charged with a high potential current, and that this, together with evidence of the cable's contact with the building, and other evidence inadequate grounding should be submitted to the jury.

An electric company is not an insurer. It can be held liable for damage to property only when negligence is shown.

Plaintiffs urge that no sufficient inspection was made to determine whether or not there was excessive sag, and claim negligence in this phase of defendant's duty.

The testimony shows that the employee whose duty it was to inspect this part of the line made a trip over the route within a month of the breaking.

No charge is made that he was an incompetent man, and it can not reasonably be argued that a trained eye would not have detected an excessive sag here of one or two wires when the third was so nearly taut as it was found to be on that day.

The requirement of inspection has been stated by other courts.

"It is (also) the duty of such (Electric Lighting) Company to make reasonable and proper inspection of its appliances.

"This duty does not contemplate such inspection as would absolutely forestall injuries." *Alabama City Etc. R. Co.* v. *Appleton,* 171 Ala., 324, 26 Ann. Cas., 1181.

"The owner or operator of an electric plant is bound to exercise reasonable care in maintaining a system of inspection by which any change in the physical condition of any part of the plant, which would tend to increase the danger to persons lawfully in the pursuit

of their business or pleasure, may be reasonably discovered." *Foley* v. *Northern Cal. Power Co.*, 14 Cal., A. 401, 112 P., 467.

"The exercise of the highest degree of care would not require appellants to search the remotest parts of their lines and wires every day to discover their condition." *Richey* v. *Jerseyville Illum. Co.*, 176 Ill., A. 495.

"The nature of the hazard is an element in determining the question.

"The frequency and nature of the inspections required depend in a measure upon this." *Warren* v. *City E. Ry. Co.*, 141 Mich., 298.

"An electric light company must use a high degree of care in inspecting the conditions of its wires," but "would not have been obliged to inspect these wires so frequently as to be at all times aware of their condition." *Jackiewicz* v. *United Illuminating Co.*, 106 Conn., 302, 138 A., 147.

The inference of negligence that makes out a *prima facie* case is of no avail to a plaintiff and will not maintain a verdict in his behalf, when defendant has shown that its appliances were of standard pattern and approved design for construction of its type. *Cosgrove* v. *K. Light & Heat Co.*, 98 Me., 473; when the appliance was properly equipped, operated and protected, *Rocap* v. *Bell Tel. Co.*, 230 Pa., 597, 36 L. R. A. (N. S.), 279; when the evidence shows the use of customary and approved appliances, *Martinek* v. *Swift & Co.*, 122 Iowa, 611; when the method of construction was proper, *Dierks L. & C. Co.* v. *Brown*, 19 Fed. (2nd), 732; when the appliance was of approved pattern and of the best material, *Owen* v. *Appalachian Pr. Co.*, 78 W. Va., 597; and when, as in this case, evidence as to proper construction was uncontradicted, it must be given its full probative force. *Brown* v. *Worumbo Mfg. Co.*, 105 Me., 31; *Loon* v. *Jones*, 113 Me., 563.

A vast volume of testimony was adduced to the effect that the electric current set the house on fire. Evidence of experts to the occurrence of arcing within the conduit pipe, its effect on the service wires, and on the meter within the cellar, affixed to a board fastened to a floor timber was given. To the jury this testimony may have seemed conclusive, despite the fact that two witnesses testified to the unbroken condition of the service wires, after the current was shut off, and that insulated wire of the type of the service wire pre-

sented practically the same residue and condition, when burned in the open air, over kindling of excelsior.

Passing this phase of the contention and the question of excessive damages, without deciding them, we hold that negligence of defendant was not proven.

Since this is so, it is unnecessary to consider the exceptions. A verdict in an action sounding in tort is against the law, if brought against a defendant on whose part negligence is not proved.

*Verdicts set aside.*
*New trial granted.*