Fred R. SOUZA and Charlotte D. Souza

v.

**BANGOR HYDRO–ELECTRIC COMPANY.**

Supreme Judicial Court of Maine.

Sept. 28, 1978.

Frederick T. McGonagle, Gorham (orally), for plaintiffs.

Rudman, Winchell, Carter & Buckley by Robert W. Kline (orally), Michael P. Friedman, Bangor, for defendant.

Before POMEROY, WERNICK, ARCHIBALD, DELAHANTY and NICHOLS, JJ.

WERNICK, Justice.

On August 25, 1975, plaintiffs Fred R. Souza and his wife Charlotte D. Souza brought a civil action in the Superior Court (Penobscot County) against defendant Bangor Hydro-Electric Company. The action sought damages for injuries sustained by the plaintiffs in consequence of plaintiff Fred Souza's coming in contact with high voltage electrical transmission wires alleged to have been negligently maintained by defendant.

In January 1978, the case was tried before a jury which, applying the principles of our "comparative negligence" law (14 M.R. S.A. § 156), found that defendant and plaintiff Fred Souza were both guilty of causa-

tive fault but that Fred Souza's causative fault was less than that of defendant. Accordingly, the jury found defendant liable to both plaintiffs and, awarding total damages of $150,000.00, the jury reduced the damages recoverable by plaintiffs to $135,000.00, as reflecting the jury's view of what was "just and equitable having regard to the claimant's share in the responsibility for the damage." Defendant has appealed from the judgment entered on the jury verdict.

We deny the appeal.

In August 1967, plaintiffs purchased a house in Quoddy Village, Eastport, Maine. At that time, Bangor Hydro's electrical supply lines stretched across the property between two utility poles located about 180 feet apart. Shortly after they bought the house, plaintiffs complained to various of defendant's employees that the electrical supply lines running over plaintiffs' property were sagging badly and were too low and too close to their house. Plaintiffs stated as a special concern that the wires posed dangers to their grandchildren who played with fishing poles. Thereafter, on at least three other occasions plaintiff Fred Souza made the same complaints to James Logan, the division manager of defendant company. Souza specifically asked that defendant tighten the wires or move the wires away from the house. Logan gave indefinite answers to the effect that he would look into the matter, but probably nothing could be done.

In her testimony plaintiff Charlotte Souza described the sag in the wires as being

".  .  .  a real sag just like a clothesline that had clothes on it for weeks, you took them off and it sagged right down."

Plaintiff Fred Souza testified that the lines were dangerous because the lines "were badly low  .  .  .  [and] sloped."

Defendant not only failed to act with regard to plaintiffs' complaints but also, sometime between August and October 1967, defendant removed one of the utility poles on plaintiffs' property and installed a new pole placed approximately four to six feet closer to the house. After installation of this new pole the high voltage transmission wire passed about 6½ feet from the nearest point of plaintiffs' house.

Kenneth St. John, a carpenter who did work on the Souza residence and had observed the sag in defendant's transmission wire, testified that the wire was about the same height as the overhanging porch on the nearest point of plaintiffs' house and that at the low point of the sag the wire was 13–15 feet above the ground and about 5 feet from the house.

Plaintiffs first moved into their Quoddy Village home on a permanent basis in December 1970, or January 1971. Prior to that time they resided in Gloucester, Massachusetts, staying only occasionally at their Quoddy Village house. Shortly after settling in at Quoddy Village, Fred Souza installed a CB antenna on the roof of the side of the house near to the electrical wire. On March 16, 1971, he decided to remove the antenna. Having placed an aluminum ladder against the side of the house, Mr. Souza climbed up to the roof, disconnected the 17 foot antenna and began to climb down the ladder. Suddenly, he felt something pull him back. The antenna, which he was holding in his right hand, had come in contact with the electrical transmission wire. Mr. Souza remained for an instant in direct contact with the 7200 volts of electricity passing through the wire, then lost consciousness and fell forward. The front part of his body and head hit the peak of the porch, and he fell to the ground.

Kenneth St. John gave testimony that about an hour after this incident several employees of defendant company arrived at the Souza residence. St. John spoke with them, the substance of the conversation being as follows:

"I just mentioned the fact that I was glad that I wasn't working around the house with a ladder or something with that wire the way it was. And he said that—I can't say that he said they were thinking of moving it or whether they had procrastinated or what, I just know that he had mentioned that this wire was under discussion, had been under discus-

sion, that they—In his own mind I think he said that he knew it should have been moved."

Plaintiff Fred Souza was taken to Eastern Maine Medical Center in Bangor. He remained unconscious for 9 days and was not discharged from the hospital until April 1, 1971. Charlotte Souza stayed in Bangor to be near her husband until three days before he was discharged from the hospital.

Shortly after Fred Souza was injured, defendant tightened the transmission wires. When Charlotte Souza returned home, she noticed that most of the large sag in the wires had been eliminated. Fred Souza, too, on his return home from the hospital, observed that the wires had been tightened.

### 1.

As a first point of appeal, defendant says that the evidence failed to establish its liability to plaintiffs. Defendant maintains alternatively (1) the evidence failed to show that defendant acted negligently toward plaintiff, or (2) even if defendant was shown negligent, the evidence established *as a matter of law* that the causative fault of the plaintiff Fred Souza was equal to or greater than defendant's causative fault.

We reject defendant's contentions.

In *Chickering v. Lincoln County Power Co.*, 118 Me. 414, 108 A. 460 (1919), this Court had under consideration the adequacy of pleadings which raised factual issues resembling those now before us. There, the complaint alleged that the defendant power company had negligently maintained its wires without protective insulation along the highway near plaintiff's residence, that the wires were negligently strung among the branches of a tree in plaintiff's yard "said wires being hidden from view by the foliage thereof, and being less than sixteen feet from the ground" and that decedent, a 12 year old child, was electrocuted and instantly killed when the wires came in contact with his body while he was playing in the tree where the wires were run.

In ruling that the complaint set forth sufficient facts to impose liability on the defendant, this Court explained:

"In the transmission of electricity high regard must be had to the safety of the public. It cannot be said as a matter of law that it is the duty of an electric company, regardless of where its line may be and as to whom injury may come, to insulate or otherwise extraordinarily guard wires strung, by virtue of a legal location, above the general sphere of hazard. This duty has been held to be limited to points where there is ground to apprehend that a reasonably prudent person may come in close proximity with the wires." (118 Me. at 418, 108 A. at 462)

This Court further ruled that the power company owed some duty to anticipate the negligence of the youth and that the existence of contributory negligence in that case was a question for the fact-finder.

Ten years later, in *Edwards v. Cumberland County Power & Light Co.*, 128 Me. 207, 212, 146 A. 700 (1929), this Court described in more general terms the basic obligation of a power company in regard to its power lines:

"In reference to the duties incumbent on the vendor of electricity, by reason of the danger it presents to those who come in contact with it, and as to the methods and appliances for its proper delivery to customers these are to be determined under the general principles of the law of negligence. . . .

"A vendor of electricity, engaged in the distribution of current over its lines to consumers, is bound to exercise due care and diligence in the construction, maintenance, inspection and operation of its lines, . . . so as to afford . . . assurance of a reasonable degree of safety."

In several jurisdictions elsewhere courts have ruled that in circumstances like those here, in which a power company maintains unprotected or unguarded electrical wires in proximity to roof areas where it is reasonably foreseeable that people will be handling television, or other, antennas, the issue of the power company's negligence toward such people is an issue of fact. See, e.

g., *Forrey v. Turpin*, 106 Ind.App. 681, 20 N.E.2d 212 (1939); *Henderson v. Kansas Power & Light Company*, 184 Kan. 691, 339 P.2d 702 (1959); *Bunten v. Eastern Minnesota Power Co.*, 178 Minn. 604, 228 N.W. 332 (1929); *Mississippi Power Co. v. Luter*, 336 So.2d 753 (Miss.1976); and appropriate cases collected in Annot., 82 A.L.R.3d 113 (1978).

■ The evidence in the case at bar plainly requires that this case be similarly decided. The evidence shows that defendant's transmission wires had sagged abnormally and were located in such close proximity to plaintiffs' house that it was reasonably foreseeable that persons would be handling objects likely to come in contact with the wires. Defendant had been actually informed of the risks created by the condition of the wires. When defendant installed a new utility pole in 1967, it had the opportunity at a very minimal cost and burden to reduce the risks of danger. Instead, defendant chose to move the wires even closer to plaintiffs' house. Moreover, as already mentioned, the evidence reveals that after the tragic incident in this case defendant tightened the electrical wires. This is probative evidence tending to corroborate the testimony that before the incident the wires were sagging excessively. See Rule 407(a) M.R.Evid. and Advisers' Note thereto.

On all the evidence, assessed in accordance with applicable legal principles, we conclude that it was a proper question to be left for jury determination whether the manner of defendant's placing and maintaining its high voltage electrical transmission wires in the vicinity of plaintiffs' house constituted negligence towards plaintiffs.

We turn to defendant's further argument that there was causative fault on the part of plaintiff Fred Souza, attributable to his wife Charlotte for purposes of her derivative recovery for loss of consortium, which was sufficient *as a matter of law* to deny defendant's liability to plaintiffs.

■ We have already noted that in *Chickering v. Lincoln County Power Co.*, supra, this Court decided that in the circumstances there involved it was a question of fact for the jury whether the conduct of plaintiff placing him in contact with defendant's power line constituted contributory negligence barring plaintiff's recovery (under the common law in effect prior to our Comparative Negligence statute). In the similar circumstances of the case at bar we likewise conclude that it was a question of fact to be decided by the jury whether plaintiff's causative fault, if any, was equal to or greater than the causative fault of the defendant.[1] The jury had warrant to find that plaintiff Fred Souza was making a legitimate use of his own property by undertaking to install an antenna on the side of his house, and that any causative fault on his part could rationally be considered minor compared to defendant's negligence in failing, though adequately warned, to use reasonable care to remedy the egregious dangers to the public created by its sagging power lines.

2.

Defendant's other point of appeal is that the jury's award of damages was excessive. We disagree.

Before deducting the amount which justly and equitably reflected Fred Souza's share in the responsibility for the damage, the jury found that plaintiffs sustained to-

1. Here, then, as in *Lyman v. Bourque*, Me., 374 A.2d 588, 590 (1977), we have no occasion to reach the question whether the "comparative negligence" statute makes it *exclusively* the prerogative of the jury to decide in *all* cases whether a plaintiff's causative fault was, or was not, equal to or greater than that of the defendant. Since this is an issue bearing on defendant's *liability*, it is arguable that it is a question different in kind from one we have already decided:—that *once defendant's liability is established*, it is solely the fact-finder's prerogative to reduce the amount of damages recoverable "to such extent as the . . . [fact-finder] thinks just and equitable having regard to the claimant's share in the responsibility for the damage." (14 M.R.S.A. § 156) See *Wing v. Morse*, Me., 300 A.2d 491 (1973); *Lyman v. Bourque*, Me., 374 A.2d 588 (1977).

tal damages of $150,000.00. Defendant concedes that this amount included $10,000.00 properly awarded for Mrs. Souza's loss of consortium ($10,000.00 being the full amount she sought in the complaint).[2] Defendant, therefore, concentrates on the $140,000.00 damages the jury awarded to Fred Souza.

An award of damages will be held excessive only if it is not rationally supportable. *Jamshidi v. Bowden,* Me., 366 A.2d 522, 524 (1976); *Wallace v. Coca-Cola Bottling Plants, Inc.,* Me., 269 A.2d 117, 122 (1970); *Baston v. Thombs,* 127 Me. 278, 281, 143 A. 63 (1928). Here, viewing the evidence most favorable to the plaintiff, we conclude that there was rational warrant for the jury's award to Fred Souza.

After coming in contact with the 7200 volts of electricity which passed through the transmission lines Mr. Souza remained unconscious for 9 days. Thereafter, he suffered much physical pain, attributable to a multiple skull fracture, a concussion, severe electrical burns on both hands and legs and electrical burns on his toes, elbows and arms and a broken rib. Plaintiff also strained his back and suffered numbness in one hand.

Although Fred Souza was confined in the hospital for only two weeks, and his medical bills were in the neighborhood of $2,000.00, the pain attributable to his injuries persisted for approximately three years, during which it was necessary for plaintiff to continue with pain medication. In 1974, Dr. Carl W. Irwin found that plaintiff still had a neurological weakness on the left side of his body (with a clumsy left arm as a result) as well as a herniated disc. At the time of the trial in January 1978 plaintiff was still experiencing pain in his head, ribs, stomach and arms.

The jury was also warranted in finding that plaintiff became mentally and emotionally disturbed as a result of his injuries. The electrocution, combined with the fall,

caused plaintiff's personality to change. He became a depressed and belligerent person with loss of memory and of power of concentration. He also lost all sexual desire. In consequence of his mental and emotional impairments Fred Souza's marital relationship seriously deteriorated.

On all the evidence the jury's award of damages was within limits of rationality.

The entry is:

Appeal denied.

Judgment affirmed.

McKUSICK, C. J., and GODFREY, J., did not sit.

---

**2.** Counsel for the parties agreed that the jury could determine damages on Fred Souza's claim and Charlotte Souza's claim for loss of consortium in one lump sum and then deduct from that amount of total damages a just and equitable sum in regard to Fred Souza's causative fault.