STATE OF MAINE
PENOBSCOT, ss

SUPERIOR COURT
Docket No. CV-07-174

BRYAN A. SMITH,

Plaintiff

v.

FINDINGS AND CONCLUSIONS

CENTRAL MAINE POWER
COMPANY,

Defendant

```
FILED & ENTERED
SUPERIOR COURT

NOV 0 6 2008

PENOBSCOT COUNTY
```

## BACKGROUND

Before the Court is a Complaint brought July 11, 2007 by Bryan A. Smith against

Central Maine Power Company (CMP). It alleges that CMP negligently caused personal

injuries to Mr. Smith due to CMP's failure to adhere to minimum height requirements for

the 19.9 kV electrical distribution line located along the westerly side Route 166 in the

Town of Penobscot, Maine. Mr. Smith sustained severe electrical injuries while

"unstepping" a mast on a sailboat on October 31, 2002. At the time of the accident, Mr.

Smith was employed by Devereaux Marine, a boatyard whose operations include

launching, hauling, repairing, and storing privately owned boats, primarily sailboats.

CMP answered the Complaint on July 20, 2007, denying the allegations. It also

asserted affirmative defenses, including comparative negligence, and the allegation that

1

Mr. Smith's injuries "were caused or contributed to by others," thus absolving CMP of any liability.

Mr. Smith is represented by Attorney Barry Mills and Attorney Lisa Cohen Lunn. CMP is represented by Attorney Mark Dunlap. The matter was tried before this Court beginning July 8, 2008. The parties submitted written closing arguments in mid-September of 2008. Although expected, rebuttal arguments were not filed by either party.

The Court has considered the testimony of all witnesses at trial, as well as testimony submitted by way of depositions, all exhibits from the parties, and their closing arguments. The Court also reviewed the legal arguments made by the parties as to Defendant's Second Motion in Limine which dealt with the "sole proximate cause" issue, as well as arguments made by the parties as to the Defendant's first Motion in Limine and Motion for Partial Motion for Summary Judgment. The Court has also reviewed the applicable provisions of the National Electrical Safety Code (Def. Exh. 1), PUC Chapter 910, the Maine Overhead High Voltage Line Safety Act, 35-A MRSA §101 et seq, and applicable case law.

## FINDINGS AND CONCLUSIONS

35-A MRSA §103 et seq establishes and governs the authority of the Public Utility Commission to regulate utilities, including Central Maine Power. Section 104 states as follows: "The provisions of this Title shall be interpreted and construed liberally to accomplish the purpose of this Title. The Commission has all implied and inherent

2

powers under this Title, which are necessary and proper to execute faithfully its express powers and functions specified in this Title.

Section 101 of Title 35-A reads as follows:

> The purpose of this Title is to ensure that there is a regulatory system for public utilities in the State which is consistent with the public interest and with other requirements of law. The basic purpose of this regulatory system is to assure safe, reasonable and adequate service at rates which are just and reasonable to customers and public utilities.

35-A MRSA §1501 provides that a public utility which violates, or causes or permits a violation of this Title, may be liable in damages to a person injured as a result of the violation.

In addition, it has long been the law in Maine that a public utility in Maine is subject to legal principles which govern the law of negligence. In *Fitts v. Central Maine Power*, 562 A.2d 690 (Me. 1989) the Maine Supreme Court held that an electric utility is "bound to exercise due care and diligence." [Citing *Edwards v. Cumberland County Power and Light Co.*, 146 A. 700 (Me. 1929)]. In *Fitts*, the Court also stated that the standard of care for a utility is "such care as an ordinarily reasonable and prudent person would have exercised under like circumstances." [Citing *O'Brien v. J.G. White & Co., Inc.*, 128 Me. 207]. Thus, consumers of electricity in Maine are entitled to the "assurance of a reasonable degree of safety." *Id.* at 212.

The Plaintiff argues that CMP was negligent because it violated PUC regulations governing vertical height clearances, deviated from its own internal safety policies, and failed to adequately train its employees in the application of those policies.

The Defendant's primary defense is that the PUC regulations relied upon by the Plaintiff are not applicable to the power lines on Route 166. In addition, the Defendant

3

argues that Devereaux Marine's negligence was the sole proximate cause of Bryan Smith's injuries. [1] In this regard, the Defendant relies on provisions of the Maine High Voltage Wire Safety Act (MHVWSA) and OSHA standards which require a ten foot setback, and notification to the utility, if work is done in close proximity to power lines. The Defendant also claims that Devereux Marine negligently failed to train its employees regarding working safely near power lines.

### CMP's Internal Waterway Clearance Standard

The parties expended much effort in debating whether Table 232-1(8) of the National Electrical Safety Code, and Chapter 910 of CMR 65-407 apply to the power lines in issue. If those regulations apply, CMC would be in violation of height requirements imposed by Maine law, and under 35-A MRSA §1501, CMP could be liable to Bryan Smith for injuries caused by any such violations.

Before determining whether those regulatory provisions apply to the power lines at Devereaux Marine, the Court finds that CMP violated its own standard for vertical clearances for these power lines. That standard is similar, although not identical, to the NESC standards found in paragraph 8 of Table 232-1. Defendant's Exhibit 30, which was admitted by agreement, requires a 45.5 vertical clearance for these power lines. The parties agree that their actual height was approximately 30 feet from the ground.

Gary Ricci, who has worked for CMP for over 30 years, has been responsible for the design and planning of CMP distribution standards since 2001. He referred to

---

[1] The parties agree that Mr. Smith's exclusive remedy against Devereaux Marine is pursuant to the Maine Workers Compensation Act. The parties also stipulated that as of June 24, 2008, Maine Employer's Mutual Insurance Company (MEMIC) has paid a total of $261,315.70 on this claim.

Defendant's Exh. 30 as a "construction standard," and it was also referred to as "Construction Standard 305-11." Mr. Ricci testified that the National Electrical Safety Code standards are incorporated into his "standards book" which contains this standard. He was asked by CMP's attorney what standard would control if there was a difference between an NESC standard and a CMP standard, and Mr. Ricci indicated that there would be no difference. The parties seem to agree that this standard was in effect within the company at the time of the accident.

The internal CMP standard at issue requires a 45.5 foot vertical clearance in "areas used for rigging and launching sailboats." The Court finds that the boatyard at Devereaux was, at the time of this accident, such an area. The Court bases this on the Court's view of the boatyard conducted on June 18, 2008, as well as photographs admitted by agreement of the parties. The boatyard is filled with sailboats lined up in rows throughout the boat yard, in areas selected based on space availability, and the need to store and work on boats on level ground. Those areas are located just up a gradual slope from a clearly-identifiable boat launch. Some of the boats sit in the yard without masts. It would be obvious to any reasonable person that it is likely that sailboats are being rigged for launching and unrigged for storage or repair at this boatyard.

In addition, the Court finds that this boatyard, in fact, rigs and launches sailboats at this site, based upon the testimony of Andrea Devereaux, James Doyle, William Stevenson, and the Plaintiff.

It is important to note that CMP's standard does not describe the size of the area, or any distance requirements between rigging areas and launching areas. However, it is clear from the view conducted that one can see the launching area from rigging areas,

5

and one can see rigging areas from the launching area. In addition, both sailboats and launching area can be seen as soon as one pulls into the driveway, and also from Route 166. (Plaintiff's Exhibit 12.) The boatyard is clearly an "area used for rigging and launching sailboats."

*Training of CMP employees regarding vertical height clearances*

On the third day of trial, five CMP employees testified about the training programs conducted by the company for employees. The Defendant's proposed finding number 43 concedes that it is the company's policy to make all employees responsible for the safety of all persons around electrical lines, not just CMP employees.

Robert Bonin has worked for CMP for almost thirty years. He started as a meter reader, then became a line worker, then a line supervisor, and he worked a safety analyst in 2002 when the accident occurred. He was unaware of any CMP standard, or state law or regulation, regarding vertical clearances for areas where boats may be rigged.

Carl Norman, a CMP employee since 1982, testified that he is a "lead line" worker. He testified that he drives by the boatyard in question two to three times a month, and had seen the crane that was located at the site, although he did not know what it was used for. He testified that all CMP employees are trained to recognize hazards that violate company standards, but was unaware of any standard or state regulation that dealt with sailboat rigging areas.

Carroll Littlefield, a 35 year veteran of CMP, was identified as a "troubleshooter" for CMP. He said he had over the years driven by the boatyard numerous times, and had

seen boats stored along the road next to the power lines. Because no boats seemed to be positioned within 10 feet of the power lines, he was not concerned with any safety issue at the boatyard. He stated that he felt that a 27-foot vertical height requirement for power lines at a rigging area was sufficient.

Peter Cella testified as a former member of CMP's Safety Committee. He conceded that no training was provided to CMP personnel regarding standards for boat rigging areas, nor were employees trained to be especially concerned about such areas.

Howard Klewen is the CMP District Line Supervisor for the Penobscot Bay area. He also stated he was unaware of any vertical height requirements for rigging areas.

It was clear from the testimony of these employees, that CMP's safety training is focused on the 10-foot requirements imposed by the MHVSA. While the employees were aware of this 10-foot rule, with the exception of Mr. Ricci, no CMP employee was called by either party to state that they were aware of the company's internal standard, much less any state law or regulation about rigging areas. Mr. Ricci knew about the existence of the internal standard and but seemed to believe it did not apply to the lines in question.

CMP argues that there was no need to provide this training to their employees, because as discussed below, CMP argues that the NESC standards relied upon in part by the Plaintiff are not applicable. This position begs the question, however, of why the CMP employees called seemed to be unaware of the utility's own standard for "areas used for rigging and launching sailboats." This failure to even be aware of internal standard puts CMP in the position of having to argue that neither the NESC or internal standards are applicable. But the failure to provide basic training about *any* vertical

clearances standards for boatyards such as Devereaux Marine undermines these arguments.

*CMP's Prior Knowledge*

CMP installed power lines along Route 166 no later than 1951. The lines were within a public right of way, and that is still the case.

The Devereaux Marine lot is part of a parcel of land that had been in the Devereaux family for approximately 200 years. Approximately two acres of this parcel sit west of the power line down to Penobscot Bay, with approximately one acre sitting east of the power line. The western portion of the parcel, which is where the accident occurred, is bounded on the north by a private driveway that goes from Route 166 down to the launching ramp on Penobscot Bay. It is bounded on the south by a single-phase CMP distribution line. The western boundary is Penobscot Bay, and the eastern boundary is Route 166 and the power line is issue. Both the single and three-phase lines carry 19.9 kV of power, and all lines are located approximately thirty feet above the ground.

The single-phase line was installed in 1985, and it replaced a previous line that had crossed the property diagonally. This was the same year Devereaux Marine began operating as a boatyard. Gary Ricci testified that he visited the site a couple of times around that time period to discuss with C. Russell Devereaux, who owned the boatyard at the time, the location of the new line. He testified that he knew that the business was called "Devereaux Marine." He also stated that he knew from speaking with Mr. Devereaux that the business put boats in the ocean, and took boats out of the ocean. He denied knowing much else about what the business did. He also indicated that while he

knew that there was a standard for vertical clearances for rigging sailboats at the time the single-phase line was relocated, he did not know what it was.

Andrea Devereaux testified that her father, C. Russell Devereaux, who is now deceased, contacted CMP around the time the boatyard started operations, to ask them to move the three-phase line to the easterly side of Route 166. She stated her father was concerned about electrical accidents. Gary Ricci denied that Mr. Devereaux discussed with him his desire to relocate the three-phase line, and stated that CMP was only asked to relocate the single-phase line to service buildings at the back of the boatyard property. CMP did relocate the single-phase line, and Devereaux Marine paid for the relocation.

In January of 1989, Andrea Devereaux Doyle and her husband, James Doyle, Jr., took over business operations, and incorporated under the name Devereaux Marine, Inc. In early 1989 Mr. Doyle went to the CMP office to talk to someone about raising the three-phase line on Route 166 so that the travel lift could move boats back and forth across the road, and also to discuss the possibility of burying the power lines on the property. Mr. Doyle testified that CMP personnel told him that they would do so, but only if he paid for the work to be done. He stated that his business could not afford to pay the price quoted. Sometime after the meeting with CMP, the three-phase line was raised to enable the travel lift to go underneath the line.

In 1998, a back-stay of a sailboat came into contact with the power line in issue, when Robert Fairweather backed a masted sailboat from the launch towards Route 166. No one was hurt in this accident, but CMP crews had to restore power to the Town of Castine as a result.

9

Howard Klewen testified that in March of 2002, after his promotion to District Line Supervisor, he saw sailboats lined up along the highway. He says he stopped by and discussed his concerns with Andrea Devereaux, who denies that any such conversation occurred. He also testified that he gave her a safety warning, and explained the 10-foot safety setback rule.

The Plaintiff questions Mr. Klewen's credibility on this issue, pointing out that he was not credible when he testified that William Stevenson made admissions at the scene of the Plaintiff's accident. The Court agrees with the Plaintiff that it is not likely that such admissions were made, since the Court finds it was likely, based upon the testimony of Mr. Bonin and Ms Devereaux, that Mr. Stephenson and Mr. Smith had been transported from the scene before Mr. Klewen arrived. However, if the Defendant is correct that Mr. Klewen warned Andrea Devereaux about the 10-foot safety setback rule, Mr. Klewen's testimony actually supports the Plaintiff's position that CMP was aware of the safety issues presented by the proximity of sailboat masts and the power lines along Route 166. Mr. Klewen, as well as the CMP employees who dealt with the Mr. Devereaux and Mr. Doyle, the CMP employees who drove by and saw the sailboat masts lined up near the power lines, and the CMP employees who were involved in restoring power to Castine in 1998, were all on notice that Devereaux Marine was an area where sailboat masts and power lines were in close proximity.

The Defendant argues that the 1998 incident proves little or nothing, because the "contact had nothing to do with the act of rigging a sailboat." (Page 6, Defendant's Proposed Findings). The Court disagrees that the accident proves nothing. The 1998 incident could have turned out as tragically as the incident that resulted in the instant

litigation, and it is sheer luck that it did not. The 1998 incident alone put CMP on notice that sailboat masts could run into power lines at Devereaux Marine, given the vertical clearances CMP maintained along Route 166. The 1998 incident, together with the interactions between CMP and Andrea Devereaux, C. Russell Devereaux, and James Doyle, Jr. establish that CMP was aware of the dangers presented by the close proximity of power lines and sailboat masts at the boatyard.

*Applicability of NESC standards to Maine law*

The parties have extensively briefed and argued about the applicability, as well as the meaning, of standards set forth in Table 232-1 of the National Electrical Safety Code.

35-A MRSA 2305-A(2) provides as follows:

> Except as otherwise provided in this section or by rules of the commission adopted pursuant to this section, every transmission and distribution utility, telephone utility and cable television company shall design, construct, operate and maintain its lines and equipment in conformance with the *applicable* provisions of the recent edition of the Standard. (emhasis added)

"Standard," according to paragraph 1C of that statute, means the National Electrical Safety Code (NESC)-ANSI-C2.

Both parties called experts to opine about whether or not Table 232-1(8) of the NESC applies to the power lines along Route 166. Paragraph 8 of that Table provides a vertical clearance requirement of 45.5 feet for "established boat ramps and associated rigging areas," as well as "areas posted with sign(s) for rigging or launching sailboats in areas serving water bodies of more than 2,000 acres." The parties agree that Penobscot Bay is a water body of more than 2,000 acres.

11

The Defendant, however, argues that the portion of the Table that contains paragraph 8 is not "applicable," because the subheading above paragraph 8 suggests that it applies only where lines cross over or overhang a launch or rigging area. The Defendant's expert, Frank Denbrock, testified that in his view the lines in issue do not "cross over" because that only applies if "lines are not in the roadway right of way and cross over the roadway or a rigging area." (Defendant's Post-Trial Brief, pg. 3) He points to the sub-heading in the table that in his view more aptly describes the surface underneath the wires in issue: "Where wires, conductors, or cables run along and within the limits of highways or other road rights-of-way but do not overhang the roadway." (Def. Exhibit 1, page 77, 78). If that is the case, as a matter of Maine state law at least, the wires need only be, according to paragraphs 9, 18.5 feet high. He emphasized his understanding of the words "cross over" and "overhang," and also emphasized the fact that the lines "run along and within" the highway or right-of-way of Route 166.

The Plaintiff's expert, David Marne, testified that in his view the lines did cross over or overhang a boat ramp and associated rigging area, as well as an area posted with signs for rigging and launching sailboats. He also testified that "common sense" would dictate that a utility has an obligation to adhere to all applicable standards, and that by maintaining vertical clearances according to paragraph 8 of the table, CMP would also be complying with the 18.5 foot requirement in paragraph 9.

The Defendant further asks the Court to engage in statutory construction of the two subheadings and to conclude that there exists an ambiguity, at least, in the Table's use of two sub-headings. The only way to resolve the ambiguity, CMP argues, is to look "to the statute's legislative history as well as other indicia of legislative intent in order to

determine" which subheading applies to the power lines along Route 166. (Def.'s

Statutory Construction Rules, pg. 2). Citing *Toomey v. Town of Frye Island*, 943 A.2d

563 (Me. 2008).

While the Court agrees that the above argument correctly states the general rule of

statutory construction, the Defendant's position fails to recognize the import, in the

Court's view, of clear language in another provision of Maine law, namely CMR 65-407-

910. The Court believes that Section 3 of the Code requires CMP to look directly at

paragraphs 7 and 8 of the NESC Table. That Section begins as follows:

> All overhead lines of an aerial utility crossing water areas
> suitable for sailing, or *public or private land and water areas*
> posted for rigging *or* launching sailboats, shall comply with
> the vertical clearance requirements of Section 232 of the
> the National Electrical Safety Code, Table 232-1, sections
> 7 and 8 thereof, together with all applicable footnotes...
> (emphasis added).

The 45.5 foot requirement for such areas first carried legal force, the parties seem

to agree, in an Order from the Public Utilities Commission dated July 19, 1988 after two

fatal accidents where sailboaters were electrocuted on Sebec Lake and on Great Pond.

That Order further noted that while new lines were required to comply with the most

recent version of the NESC, there was in fact no requirement that older lines, such as

those along Route 166, comply with the "water crossing requirements of the Code."

(Plaintiff's Exh. 5).

CMR 65-407-910 was promulgated on July 1, 1990, and eliminated the

distinction between old and new lines. It also provided a definition of "areas posted for

rigging or launching sailboats" to include "any area that by signs, launching ramps, or

other special facilities, land improvements or use indicates that the area is intended to be

13

used by the public for rigging or launching sailboats." (Plaintiff's Exh. 7). When the PUC issued its Order adopting this new Rule, it stated it was intended to "impose an additional safety measure beyond what the current Code requires." (Plaintiff's Exh. 6).

The Court finds that Devereaux Marine is an area that, by use, "is intended to be used by the public for rigging or launching sailboats." Therefore CMR 65-407-910 points CMP directly to paragraphs 7 and 8 of Table 232-1 of the NESC.

The Court bases this finding on the fact that the boatyard is indeed a private company, but its customers are, as CMP concedes, members of the public. The boatyard along both the triple-phase and singe lines is filled with stored sailboats. The boats were stepped and unstepped where they were stored. The Court is not persuaded that "public" can rationally be read as narrowly as urged by CMP. According to the Defendant, only public boat launches shown on the current public access inventory maintained by the Department of Conservation. However, the citation relied up by the Defendant is not as limiting as the Defendant urges. It states: "We intend that *within* such definition would be all boat launching sites shown on the current public access inventory." (Emphasis added). That provision, contained within the Order and Factual Findings and Policy Statement of July 19, 1988 does not support the Defendant's interpretation that it applies *only* to such sites. CMR 65-407-910 directs CMP to provide a 45.5 foot vertical clearance in any area intended to be used by the public, not just those on the inventory. Such a narrow interpretation is at odds with the liberal interpretation and construction that the Court must apply, according to 35-A MRSA § 104.

Because the Court finds that CMR 65-407-910 controls, it is not necessary to resolve any ambiguity that might exist in the two subheadings of Table 232-1. The Code

points CMP directly to paragraphs 7 and 8 of the Table. The Court therefore declines to determine, as a matter of law, if the first clause of paragraph 8 applies to the lines along Route 166, that is, "established boat ramps and associated rigging areas." The Court does find as fact that the boatyard is such an associated rigging area. The Court makes that factual finding for the same reasons that it found that the boatyard is an "area used for rigging and launching sailboats," in the findings made above regarding CMP's internal vertical clearance standard.

Taking these findings together – CMP's failure to comply with CMR 65-407-910, its prior knowledge of the proximity of sailboat masts and power lines along Route 166, its failure to follow its own vertical clearance standard, and its failure to adequately train key safety employees about even the existence of this standard and the law of Maine -- the Court finds that CMP failed to exercise due care and diligence in its operation and maintenance of the power lines along Route 166 in Penobscot, Maine.


*Causation*

The Plaintiff must prove not only that CMP was negligent, but also that CMP's negligence was the proximate cause of Bryan Smith's injuries. CMP makes two arguments on the issue of causation. First, it argues that there is insufficient evidence to support the Plaintiff's argument that a 45.5 foot vertical clearance would have prevented this accident. The second argument is that Devereaux Marine's own negligence, in the form of violations of OSHA and MHVWSA requirements of a 10-foot setback and notification, was the "sole proximate cause" of the Plaintiff's injuries.

15

With respect to the first argument, the Court accepts many of the factual findings proposed by the Defendant. Proposed Finding 81 asserts that the mast was 35 feet, four inches long. Proposed Finding 80 asserts that the deck of the customer's sailboat was 9 feet 8 inches off the ground. Therefore, when the mast was placed upright at a ninety degree angle it was approximately 45 feet from the ground. In addition, the power line in question was approximately 30 feet from the ground. (Proposed Finding 82). The Court also accepts Proposed Finding 79 that it "was while his back (Stevenson's) was turned that the mast made contact with the power line." The Court would also note Proposed Findings 75, 76 and 78 which establish that Stevenson had lowered the mast at an angle to the Plaintiff, who was standing on the ground and holding it at approximately waist-level, when Stevenson turned his back. Finally, the butt of the mast was approximately three feet off the ground, if one reads Proposed Finding 83 and 84 together. The Court infers that if the Plaintiff was holding the mast straight up, and not at an angle, the tip of the 35 foot, 4 inch mast would have been 38 feet, 4 inches in the air.

Assuming those facts are true, it is implausible that a mast of this same length, held with a butt end three feet off the ground, at less than a 90 degree angle, would have contacted a power line with a vertical clearance of 45.5 feet. The Court therefore finds that this accident would not have occurred if CMP had maintained a 45.5 foot vertical clearance.

With respect to the issue of "sole proximate cause," the Defendant points out that Devereaux Marine had no formal training for its employees regarding working near or under power lines. It also provided no written materials, safety equipment or signage warning employees of such hazards. William Stevenson, the boatyard manager, was

unaware of the MHVWSA or OSHA regulations requiring unqualified persons to notify CMP if they were going to be working within 10 feet of a power line. The Court agrees that those facts have been established by the Defendant.

It has not been established on this record that the accident actually occurred while either Mr. Stevenson or Mr. Smith were themselves within 10 feet of the power lines. [2] However, Defendant's 14 and Defendant's 15 establish that Devereaux Marine was indeed cited by OSHA for two violations as a result of this accident. The former points to inadequate training for working near power lines, and the latter points to a federal regulation that prohibits any "unqualified person" from working in an elevated position in a "such that the person and the longest conductive object" were less than 10 feet from unguarded power lines. It is clear that the mast itself, while being handled by Mr. Smith, actually touched the power line. Therefore, it has been established that at the time Mr. Smith was injured, Devereaux Marine allowed him to work in violation of the federal regulation as defined by Defendant's Exh. 15. The Court further agrees with the Defendant that Devereaux Marine was negligent in failing to train Mr. Smith or other "unqualified" employees about safely working under power lines, and allowing them to handle sailboat masts too close to power lines, in violation of federal regulations and the MHVSA. The issue for the Court is whether this negligence by Devereaux was the "sole proximate cause" of the Plaintiff's injuries.

The Plaintiff argues that there is "no evidence that any mast on any stored boat was ever closer than 10 feet from the power line until the instant when the mast suddenly contacted the line, causing Bryan's injuries." (Plaintiff's Post-Trial Memorandum, pg.

---

[2] Proposed Findings 71 and 72 posit two points in time just before the accident when the mast was just six inches outside the 10 foot limit, and when the person handling the mast plus the mast were within 10 feet of the power line.

10). The Court does not agree that this statement adequately describes the facts at hand, since Mr. Smith was not injured while the masted boat was stored. The accident occurred when it was being unstepped.

Considering all of the above-referenced findings proposed by the Defendant and accepted by the Court, together with the largely-undisputed distances and measurements taken by the parties, it can hardly be said that Devereaux Marine's negligence, such as it was, was the "sole proximate cause" of this particular accident. The Court can envision many scenarios by which this sailboat mast given its location, either stepped or while being unstepped, could have come into contact with power lines which were 30 feet off the ground. It is much more difficult to envision a scenario in which this sailboat, even if it was located closer to the lines than it was, could have come into contact with a line with a 45.5 foot clearance – unless perhaps it was stored directly underneath the lines, which it was not. What caused this mast to contact the power line on October 31, 2002 was not *solely* that the work was performed either within10 feet of the three phase line at some points in time during the unstepping process. The accident was caused by the fact that this 35 foot, four inch mast, with its butt end held three feet off the ground at an angle of less than 90 degrees, hit a power line that was set at 30 feet, and not at 45.5 feet, as required by law. If the law allowed these lines to have a vertical clearance of 30 feet, the Court might reach a different conclusion, but the law required the lines to have a 45.5 foot vertical clearance. [3]

The basis for the "sole proximate cause" defense is "that some other actor or force (whether or not a party) is the *only* proximate cause of an accident, therefore all others

_____

[3] It is perhaps worth noting that the failure to maintain proper vertical clearances for these lines is only part of the factors the Court relied upon in its finding that CMP was negligent.

are insulated from liability." *Bukowski v. Geo. A. Hormel & Co.,* 157 F.R.D. 50 (S.D. Iowa 1994). (Emphasis added).

The Court cannot find on this record that Devereaux Marine's negligence was "the sole proximate cause" of Bryan Smith's injuries. The Court therefore finds that the Plaintiff has carried its burden of proof in this negligence action.

### Damages

CMP concedes in its argument that "It is clear that Bryan Smith has suffered injuries in all categories recognized by the Maine Law Court." CMP also states that "Plaintiff's past medical expenses and post *(sic)* lost wages are well established and are not the subject of contest." (Pg. 21, Defendant' Post-Trial Brief).

The Court finds Plaintiff's past medical expenses to be $231,194.73, as agreed by the parties.

The Plaintiff urges the Court to accept the findings of future rehabilitation costs to be $551,913. That was the figure computed by Barbara Bate, an expert life care planner whose report was admitted as Plaintiff's Exh. 20. The Defendant did not provide expert opinion rebutting Ms. Bates's methodology or opinion. The Court has reviewed her report, considered her testimony, and finds that her conclusion is well-supported by its foundations. The Court therefore accepts that Mr. Smith's future rehabilitative needs require this sum, which reflects a reduction to present value.

The Court therefore finds that Mr. Smith is entitled to the sum of $783,108 for past and future medical and rehabilitation damages.

The Plaintiff called Lawrence Copp, a well-qualified economist, who testified by deposition on May 29, 2008 as to Mr. Smith's lost income due to this accident. The Defendant called no expert to challenge his methodology or conclusions. As foundation for his opinion, Mr. Copp relied upon reports and telephone consultations with Ms. Bate and other medical and vocational experts. Among them was Jacques Violette, a Vocational Rehabilitation Counselor, whose report was admitted as Plaintiff's Exh. 19. Mr. Violette determined that Mr. Smith's residual work capacity is limited to "sedentary to light." Mr. Violette provided information about what Mr. Smith could have earned if he was able to return to the Air Force, which had been his longstanding goal.

The Plaintiff testified that he had recently been medically discharged before the accident from the Air Force, due to a foot injury that required surgery. The Air Force required him to be medically "cleared" for one year before he could return to the military. Mr. Smith testified credibly that being in the Air Force had been his goal since he was a child. His plan was to serve as an airplane mechanic. Although this dream had been temporarily deferred by his bunion injury, the Court accepts his testimony and finds that it was likely that he would return to the Air Force.

The Court finds also, based on the testimony of the Plaintiff, his father and employers, that Mr. Smith had, and still has, a strong work ethic. He has since the injury attempted to hold jobs, even when the jobs he undertook caused him further physical pain and injury. It is clear that one of the hardest things Mr. Smith has had to accept as part of the devastating physical and neurological injuries he has experienced, is that no matter how hard he tries, he will never reach his goal of serving in the Air Force.

The Court also finds that it is unlikely that Mr. Smith could now obtain an advanced or associates degree. The Court bases this on the unrebutted testimony of the Plaintiff's expert neuropsychologist, Dr. Anthony Podraza. Mr. Smith clearly has accident-related neurological deficits, and he struggles with accident-related depression. Finally, given the fact that he graduated from high school and went off to the Air Force, and not to college, it seems unlikely that he was, as the Plantiff states, "college-bound" before the accident. (Plaintiff's Post-Trial Memo, pg.46.)

The Court recognizes that there cannot be absolute certainty about the kind of economic future Mr. Smith would have had if the accident had not occurred. However, the Court finds that it is reasonable to assume, as the basis for projecting his future earning potential, what he could have earned in the Air Force had he not been injured. The Court finds based on the opinion of Mr. Copp, that the present value of Mr. Smith's lost earnings is $1,107,523.

The total of Mr. Smith's special damages constituting past and future medical expenses, and lost earnings, comes to $1,890,631.

In determining the amount of damages Mr. Smith should receive for his loss of enjoyment of life, pain and suffering – what the Plaintiff calls "general damages" – the Court considers the following facts, none of which are really subject to dispute.

Mr. Smith was in a hospital for two months. He endured many painful surgeries and procedures. Those procedures included frequent, sometimes daily, debridements which consist of peeling away dead skin and tissue. He has had multiple skin grafts. He lost his right big toe, as well as the right metatarsal bone in his foot, through amputations. Dr. Celia McLay, a physiatrist, testified by deposition that these amputations have had

21

profound consequences for his gait, weight-bearing and stability. It is not uncommon for him to roll his ankle and/or fall. He has a permanent limp. He has more than once "blown out" the bottom of his right foot while walking on it because of its lack of structural and tissue integrity. He has been urged not to work at least once by his physiatrist because standing on his feet was preventing his foot from healing, and was in fact re-injuring it. Mr. Smith has significant loss of feeling in his fingers of his left hand, and the function of his hand is much diminished. He cannot feel heat or cold in this hand, and is therefore vulnerable to burning or other injuries to this extremity.

Mr. Smith has scars that are very difficult to look at, including skin flaps on his left wrist and a skin flap on his right foot. Both his wrist and hand are terribly disfigured. One prominent scar is on his left side, into which his left hand had to be sewn for three weeks to keep tissue from dying while it was healing, and he has another on his abdomen. He had to undergo additional surgeries to have tissue expanders put in his abdomen, and later removed, as part of the process of repairing or removing scar tissue.

Mr. Smith has significant neurocognitive defects, depression and post-traumatic stress disorder. The Court finds that these are all related to his accident. He lost 55 pounds while in the hospital, but has gained that and much more back due to immobility. He spent much of his time in the hospital, and while in recuperation at his parent's home, in a drug-induced sleep. He suffers from chronic pain, although it has waxed and waned with various medical procedures and setbacks. He had to take opiates for his pain from the time of the accident to the spring of 2008, when he finally stopped taking them on his own.

Mr. Smith used to be a runner, and can no longer do so. He is able to continue to hunt and fish, but he must do so while seated. He often needs assistance to button pants or shirts. He required assistance going to the bathroom for approximately six months after the accident.

Dr. Philip Kimball conducted an evaluation of Mr. Smith for Maine Employer's Mutual Insurance Company in January of 2008, and concluded that he has sustained a 42% whole body permanent impairment injury as a result of his electrocution.

After considering all of the above, including the Plaintiff's demeanor and presentation at trial, the Court concludes that this is a case requiring significant compensation for general damages. Mr. Smith has endured extreme physical pain, and now has chronic pain. His life has been permanently altered, and in many ways diminished. He has permanent disfigurement, and permanent physical impairment. He has admirably tried under very difficult circumstances to work for a living, and to be as independent as he can. Nevertheless, it is likely that his neuropsychological injuries are permanent as well, and according to Dr. Podraza, some persons who have survived electrocution actually decline over time in their functioning.

The Court awards Mr. Smith $3,000,000 in general damages.

The entry will be:

The Plaintiff has proven by a preponderance of the evidence that Central Maine Power was negligent, and that its negligence proximately caused his injuries.

The Court finds that the Plaintiff is entitled to damages in the total amount of $4,890,631. The Plaintiff is further entitled to interest and costs.

Counsel for the Plaintiff is directed to prepare a Judgment consistent with these findings.

The Clerk shall note these Findings and Conclusions on the docket pursuant to Rule 79(a) of the Maine Rules of Civil Procedure.

11 / 3 / 08
**DATE**

**SUPERIOR COURT JUSTICE**

24

STATE OF MAINE                                     SUPERIOR COURT
Penobscot, ss.                                     Docket No. CV-2007-00174

BRYAN A. SMITH of Bangor,            )
Penobscot County, Maine,             )
                                     )
            Plaintiff,               )
                                     )
            v.                       )         **Judgment**
                                     )
CENTRAL MAINE POWER                  )
COMPANY, a Maine corporation         )
with its principal place of business )
in Augusta, Kennebec County,         )
Maine,                               )

FILED & ENTERED
SUPERIOR COURT

NOV 1 4 2008

PENOBSCOT COUNTY

In accordance with the Findings and Conclusions of this Court dated November 3, 2008,

IT IS ORDERED That Judgment be entered for Plaintiff against the Defendant in the amount of

$4,890,631 with prejudgment interest at the rate of 7.99% per annum and post-judgment interest

at the rate of 9.42% per annum and costs.


Dated: November 14, 2008

_____
Justice Michaela Murphy

---------------------------------------------------------------------------------

```
    SEQ TITLE              NAME                                    DOB   ATTY
    001 PL         BRYAN A SMITH  BY: Lisa Lunn, Esq. & Barry Mills, Esq.   T
    002 DEF        CENTRAL MAINE POWER COMPANY   BY:  Mark Dunlap, Esq.     T
```